Crispulo **LOPEZ–FLORES**, Plaintiff,

v.

**RESOLUTION TRUST CORPORATION, et al., Defendants.**

No. 99–CV–73444.

United States District Court,
E.D. Michigan,
Southern Division.

April 20, 2000.

836

Crispulo Lopez–Flores, Detroit, Michigan, pro se.

Angela J. Thorpe, Dallas, Texas, for Federal Deposit Insurance Corporation and Resolution Trust Corporation.

Paul M. Stoychoff, Troy, Michigan, for Franklin Credit Recovery Fund XXII, L.P.

## ORDER

COOK, District Judge.

On July 12, 1999 the Plaintiff, Crispulo Lopez–Flores, acting without the benefit of counsel, initiated this lawsuit against the Defendants, Resolution Trust Corporation ("RTC,")[1], et al., whom he contends, *inter alia,* improperly exercised their powers under 12 U.S.C. § 1821 of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). In response, the RTC moved to dismiss this

---

1. In 1995, the Federal Deposit Insurance Corporation ("FDIC") statutorily succeeded the RTC. *See* 12 U.S.C. § 1441a(m)(1). Hence, the FDIC is the real party in interest in this litigation. However, in an effort to avoid any confusion between the factual and legal portions of this Order, the Court will refer to the Defendant agency throughout as the "RTC."

case for lack of subject matter jurisdiction, asserting that the Plaintiff had failed to exhaust all of his requisite administrative remedies. Alternatively, the RTC argued that the FIRREA prescribes that venue for this action should lie in Texas or Washington, DC, rather than in Michigan.[2]

On November 18, 1999 the Court heard the parties' arguments in connection with the instant motion. For the following reasons, the RTC's request is granted in part, and denied in part.

## I

In 1986 the Plaintiff's son, Luis R. Lopez, obtained a thirty-year mortgage loan from the Mutual Building & Loan Association ("Mutual") in order to buy a parcel of real property in Texas.[3] Less than three years later (to wit, January 1989), Luis Lopez informed Mutual that (1) his father would assume all responsibility for the payment of the mortgage, and (2) all future correspondence relating to the loan should be forwarded to the Plaintiff at his address in Detroit, Michigan.[4]

Thereafter, Mutual sought to obtain personal information from the Plaintiff in order to begin the process of officially including him on the mortgage papers. However, this process was not completed because in 1989 or 1990, Mutual filed for bankruptcy.[5] As a result, the Plaintiff's name does not appear on the mortgage contract or upon any other official document relating to the property.[6] Nonetheless, there is every indication from the pleadings that the Plaintiff has been "in charge of financial matters related" to the mortgage since February 6, 1989.[7]

The RTC was the first organization to assume control over Mutual's bankrupt operations, including its oversight responsibilities for the mortgage at issue. Later, an intermittent institution contracted with the RTC to manage the loan. Finally, in November 1994, the loan was transferred to another Defendant, the Franklin Credit Recovery Fund XXII L.P. ("Franklin Credit").[8] Significantly, each of these financial institutions dealt directly with the Plaintiff—not Luis R. Lopez—on matters of payment.

In his Complaint, the Plaintiff contends that he has been injured by the transfer of the mortgage to Franklin Credit because (1) he was neither informed of his rights and responsibilities during the transfer nor given an opportunity to buy out the mortgage in violation of the procedures that had been established by and for the RTC, and (2) Franklin Credit is charging him with exorbitant sums and has failed to pay his property taxes and insurance out of an escrow account.[9] Since November 1994, the Plaintiff has paid more than thirty-six thousand dollars ($36,000.00) to Franklin Credit.[10] Now, he asks the Court to (1) nullify the transfer of the mortgage to Franklin Credit (and any subsequent transfers or sales), (2) credit him with the monies that he has paid, and (3) require the RTC to abide by its procedures, which,

---

2. The parties also have a dispute as to whether a certificate of deposit, which had been purchased by the Plaintiff in connection with the mortgage, was suitably handled.

3. Compl. ¶¶ 1–2. The amount of the mortgage was $58,000.00 at an interest rate of 8.25%. (Compl.¶ 2.) The Plaintiff has alleged, and the Defendants have not presently challenged, that at all times relevant before this dispute erupted, all mortgage payments were made.

4. Compl. ¶ 4.

5. Compl. ¶¶ 7–10. Sometime thereafter, Stonehenge Corporation took over the mortgage,

charging 6.25% interest on the loan. (Compl.¶¶ 15, 21.)

6. Compl. ¶ 5.

7. Compl. ¶ 5.

8. Compl. ¶ 14.

9. Compl. ¶¶ 16, 20.

10. Compl. ¶ 18. This sum does not include the amounts that were paid by him between February 1989 and October 1994.

among other things, would enable him as a low income debtor to exercise the right of first refusal to pay off the mortgage before the loan is transferred to a clearinghouse.

## II

During the hearing on November 18, 1999, the Court expressed its concern about the Plaintiff's standing to litigate this matter.[11] Standing is a fundamental issue that must be resolved before the Court grapples with the complex questions of statutory construction that surround the RTC's motion.[12]

 "[T]he party invoking federal jurisdiction bears the burden of establishing its existence." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (citing *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990)); *see Cutshall v. Sundquist*, 193 F.3d 466, 471 (6th Cir.1999). Where, as here, a question of standing arises in connection with a motion to dismiss under Federal Rule of Civil Procedure 12(b), the Court must base its decision on the pleadings and will "presume that the general allegations in the complaint encompass the specific facts necessary to support those allegations." *Steel Co.*, 523 U.S. at 104, 118 S.Ct. 1003; *see American Fed'n of Gov't Employees v. Clinton*, 180 F.3d 727, 729 (6th Cir.1999) ("For purposes of ruling on a motion to dismiss for lack of standing, a complaint must be viewed in the light most favorable to the plaintiff; all material allegations of the complaint must be accepted as true.").

Moreover, because the Plaintiff is without the benefit of counsel, the Court will read the Complaint in a more liberal manner than it would if an attorney had been responsible for the pleading. *See, e.g., Hughes v. Rowe*, 449 U.S. 5, 10, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980); *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Indeed, "[t]he appropriate liberal construction requires active interpretation in some cases to construe a *pro se* [pleading] 'to encompass any allegation stating federal relief.'" *Franklin v. Rose*, 765 F.2d 82, 85 (6th Cir.1985) (quoting *White v. Wyrick*, 530 F.2d 818, 819 (8th Cir.1976)) (discussing *pro se* petitions for writs of habeas corpus). Thus, this Complaint should not be dismissed for lack of standing unless it appears from an overall examination of the allegations therein that the Plaintiff could not have standing to assert any discernible, tenable federal claim.

### A

The doctrine of standing has a constitutional, as well as a prudential, component. *See Federal Election Comm'n v. Akins*, 524 U.S. 11, 19–20, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998). The constitutional roots of this doctrine can be found in Article III, § 2, which grants jurisdiction to the federal courts to hear only "Cases" and "Controversies." *See Clinton v. City of New York*, 524 U.S. 417, 429, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998); *Steel Co.*, 523 U.S. at 92, 118 S.Ct. 1003; *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).[13]

11. The Court requested further briefing on this issue. Since that time, the parties have submitted additional briefs to support their respective positions.

12. Because two jurisdictional issues are presented here, it is necessary to determine the order of their disposition. "Ordinarily, [an] Article III court must be sure of its own jurisdiction before getting to the merits." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 119 S.Ct. 2295, 2307, 144 L.Ed.2d 715 (1999) (considering issue of class certification prior to addressing whether lead plaintiff had

standing to raise claims of other class members). However, if the merits are bound up with issues of statutory standing that are "logically antecedent" to issues of justiciability, statutory standing should be addressed first. *Id.* Here, the RTC has identified an issue of statutory standing, but this matter is not logically antecedent to the more general issues of standing. Hence, the statutory issue will receive secondary consideration.

13. "[T]he doctrine ... serves to identify those disputes which are appropriately resolved through the judicial process." *Whitmore v.*

■ In order to distinguish such appropriately resolvable matters from other disputes, the federal courts are obliged to ask two basic questions about the character of the lawsuit and the litigants. First, courts enquire whether the litigation more closely resembles a traditional lawsuit rather than a historically legislative or executive activity. *See generally Akins,* 524 U.S. at 23, 118 S.Ct. 1777 (generalized grievances are better suited to legislative, not judicial, processes). In this respect, the standing doctrine preserves a fundamental principle of American government—the separation of powers. *See Steel Co.,* 523 U.S. at 102, 118 S.Ct. 1003 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559–60, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Second, even if the lawsuit does serve a proper judicial function, courts must "focus[ ] on whether the plaintiff is the proper party to bring this suit, although that inquiry 'often turns on the nature and source of the claim asserted.' " *Raines v. Byrd,* 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (quoting *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)); *see* Richard H. Fallon, Jr., Daniel J. Meltzer & David L. Shapiro, *Hart & Wechsler's The Federal Courts and the Federal System* 136 (4th ed. 1996) ("The Supreme Court has frequently stated that standing questions relate to parties—to the nature and sufficiency of the litigant's concern with the subject matter of the litigation—rather than to the fitness for adjudication of the legal issues tendered for decision.").

In order to provide a structure for these ethereal inquiries, the Supreme Court has stated that standing will be found when a plaintiff "allege[s] personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen,* 468 U.S. at 751, 104 S.Ct. 3315, *quoted in Department of Commerce v. United States House of Representatives,* 525 U.S. 316, 329, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999). These are the elements of injury, causation, and redressability. *See Cutshall,* 193 F.3d at 471 ("This triad of injury in fact, causation, and redressability comprises the core of Article III's case-or-controversy requirement . . . ."). The elements should be interpreted in a manner that is consistent with the basic questions that they were meant to answer in order to ensure that the doctrine fulfills its underlying constitutional purpose.

Here, the Court is satisfied that the allegations are sufficient to withstand the motion to dismiss on the issues of whether (1) the RTC caused the harm about which the Plaintiff complains, and (2) the harm is, in some way, judicially redressable. *See generally Steel Co.,* 523 U.S. at 103, 118 S.Ct. 1003. The most significant constitutional question is whether his alleged injury is of the type that supports a claim of standing.

■ The Plaintiff essentially asserts a claim under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702,[14] which provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review there-

*Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990), *cited in Steel Co.,* 523 U.S. at 102, 118 S.Ct. 1003 ("Standing to sue is part of the common understanding of what it takes to make a justiciable case."); *see Steel Co.,* 523 U.S. at 92, 118 S.Ct. 1003 (the Court has "always taken [Article III] to mean cases and controversies of the sort traditionally amenable to and resolved by the judicial process").

14. Congress specifically intended that the RTC would be subject to the APA for its actions following the enactment of the FIRREA. *See* H.R.Conf.Rep. No. 101–222, at 410 (1989), *reprinted in* 1989 U.S.C.C.A.N. 432, 448 ("Both the RTC and its Oversight Board will constitute an 'agency' for purposes of title 5 of the United States Code, provided however that when the RTC is acting in its capacity as conservator or receiver it shall have the same status as the FDIC acting in such a capacity.").

of."[15] His primary asserted injury is the alleged failure of the RTC to abide by statutorily mandated administrative procedures in the disposition of properties that are owned by lower income families. According to 12 U.S.C. § 1441a(c)(2)(B) (1989),[16] the RTC, when opting to make a single-family home like the property at issue available for sale, was obliged to initially offer the home for sale to those families whose median income fell below a certain level.[17] This section is consistent with one of the central purposes of the FIRREA and other federal regulations that govern the savings and loan industry; namely, to secure and provide affordable housing to the general public. *See* H.R.Rep. No. 54(1), 101st Cong., 1st Sess. 309, *reprinted in* 1989 U.S.C.C.A.N. 86, 105 ("A major tenet of [the FIRREA] ... is a commitment to maintain a separate and viable industry charged with promoting home ownership through the provision of affordable mortgage credit."), *quoted in* Anne M. Taylor, *The FDIC's Enhanced Powers Over Savings Institutions: Does FIRREA Make It "SAIF"?*, 59 Fordham L.Rev. S381, S410 n. 68 (1991); *cf. United States v. Winstar Corp.*, 518 U.S. 839, 844, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (interpreting the FIRREA and noting that the "savings and loan ... industry [has been, in part,] 'a federally-conceived and assisted system to provide citizens with affordable housing funds.'") (quoting H.R.Rep. No. 101–54(I), at 292 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 88).

The Plaintiff complains that he met the criteria under § 1441a, and as such, should have been given an opportunity to accept an offer of sale of the subject property. Additionally, there is evidence in the record that the RTC circulated a policy statement, which indicated that low-income homeowners would have a right of first refusal to purchase their own properties before the homes were placed on the open market for sale. Accepting the Plaintiff's allegations as being true for the purpose of this motion, it appears that he neither received such an opportunity to acquire the subject property nor was informed of the balance of the loan before it was transferred to Franklin Credit.[18] Hence, the Plaintiff has set forth an allegation of a cognizable injury that is sufficient to satisfy the constitutional standing requirement.[19]

### B

The doctrine of standing also has a prudential aspect, which precludes, among other things, third-party standing. *See*

---

15. Section 702 further states:
The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided,* That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

16. The RTC was established by 12 U.S.C. § 1441a(b) (1989).

17. The current form of § 1441a is substantially the same.

18. It is also alleged by the Plaintiff that his son was not given an opportunity to buy the property.

19. It is implicit in this conclusion, and from the text above, that the Plaintiff is within the zone of interests covered by the statute. Importantly, in reference to Article III standing, it is of no moment whether the Plaintiff's son might have standing to bring this suit. "[M]ore than one party may have standing to challenge a particular action or inaction. Once it is determined that a particular plaintiff is harmed by the defendant, and that the harm will likely be redressed by a favorable decision, that plaintiff has standing—regardless of whether there are others who would also have standing to sue." *City of New York,* 524 U.S. at 434–36, 118 S.Ct. 2091.

*Allen,* 468 U.S. at 751, 104 S.Ct. 3315 ("Standing doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights...."). Here, it is debatable if the Plaintiff has standing to litigate a claim that pertains to his son's mortgage or whether the son is better situated to litigate the matter.

■ The Court is satisfied that the Plaintiff is the proper party to bring this suit for two reasons. First, to the extent that federal law and regulations gave him a personal interest in receiving a right to first refusal to purchase the mortgage, he has asserted his own rights, rather than those of his son.[20] Second, this litigant and lawsuit are certainly of the character that make this litigation a proper dispute for adjudication. The Plaintiff, who is a low income earner, has invested more than $36,000.00[21] and ten years of payments in the mortgage that he now stands to lose. By contrast, Louis R. Lopez paid less than two years' worth of payments. In this situation, it is the father, rather than the son, who has the financial incentive to endure the costs of litigation and vehemently pursue his case.

Importantly, the case does not present the dangers that are associated with third-party claims. The parties unquestionably have been adverse, and nothing suggests that the father would pursue a claim of which Louis R. Lopez would disapprove or refrain from raising a legal issue that the son might proffer to the Court. Additionally, since the Plaintiff has been intimately involved with the administration of the mortgage, he is well situated to assist in the development of the facts. Given the close relationships that are present and the financial impediment to the son's litigation of this issue, the Plaintiff is not prevented, as a prudential matter, from sub-mitting his claim against the Defendants. *See generally Miller v. Albright,* 523 U.S. 420, 446, 118 S.Ct. 1428, 140 L.Ed.2d 575 (1998) (O'Connor, J., concurring) ("[A] litigant seeking to assert the rights of another party must satisfy three interrelated criteria: 'The litigant must have suffered an injury in fact, thus giving him or her a sufficiently concrete interest in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests.'") (quoting *Powers v. Ohio,* 499 U.S. 400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991)). On the basis of the facts that have been made known to the Court, the character of the parties and lawsuit here make this a case or controversy that should be heard by this federal court.

### III

Having ascertained that the Plaintiff has standing to litigate this matter, the Court now turns to the statutory issues that have been presented in the RTC's motion to dismiss.

### A

The Defendant seeks a dismissal of the Complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). In order to adequately support the motion, the RTC must present the Court with one of two circumstances. First, the movant can argue that the allegations in the Complaint are insufficient to establish jurisdiction. "In reviewing such a facial attack, a trial court takes the allegations in the [C]omplaint as true, a similar safeguard to that employed under 12(b)(6) which governs motions to dismiss." *Jones v. City of Lakeland,* 175 F.3d 410, 413 (6th Cir.1999) (citing *Ohio*

---

**20.** It is unchallenged that Congress has the authority to override prudential standing doctrines through legislation.

**21.** From the pleadings, it appears that the Plaintiff has paid more than fifty thousand dollars ($50,000.00) during the life of the loan.

*Nat'l Life Ins. Co. v. United States,* 922 F.2d 320, 325 (6th Cir.1990)). Alternatively, the Court may resolve the matter on the basis of the Complaint and other facts, whether disputed or undisputed.[22] *See Meliezer v. RTC,* 952 F.2d 879, 881 (5th Cir.1992).

Following a proper challenge to the subject matter jurisdiction of this Court, "the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Jones,* 175 F.3d at 413 (citing *Moir v. Greater Cleveland Reg'l Transit Auth.,* 895 F.2d 266, 269 (6th Cir.1990)).[23]

**B**

 The statutory issue here (to wit, whether the FIRREA has set forth an administrative procedure as a condition precedent that must be invoked before this lawsuit can proceed) is a complicated and technical one. It is clear that the statute delineates an administrative procedure for claims against the RTC in its capacity as a receiver. *See* 12 U.S.C. § 1821(d)(3)–(13). Moreover, "[w]here relief is available from an administrative agency, the plaintiff is ordinarily required to pursue that avenue of redress before proceeding to the courts; and until that recourse is exhausted, suit is premature and must be dismissed." *Reiter v. Cooper,* 507 U.S. 258, 269, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993). With respect to § 1821, the United States Court of Appeals for the Sixth Circuit ("Sixth Circuit") has stated, "[a]lthough [the] FIRREA does not contain an express exhaustion requirement, courts have unanimously inferred such a requirement from the statutory scheme. . . ." *Holmes Fin. Assocs. v. RTC,* 33 F.3d 561, 563 n. 1 (6th Cir.1994).[24] Hence, it is uncontroversial that to the extent § 1821 requires a claim to be submitted to a governmental agency for an administrative determination, the failure to do so will undermine federal jurisdiction. *See Buckholz v. FDIC,* 129 F.3d 868, 871 (6th Cir.1997) (creditor claim for monetary relief could proceed in federal court only after administrative review under FIRREA was complete, although such claim could have been filed prior to administrative adjudication and then stayed).

The Defendants contend that § 1821 bars the application of federal jurisdiction for any action if the legal claims therein are not presented in accordance with the administrative procedures in the statute.[25] To date, there is no evidence or argument that the Plaintiff utilized or complied with those procedures.[26]

**22.** "Any factual findings by the district court in resolving a motion to dismiss are [subject to] review[ ] only for clear error." *Jones,* 175 F.3d at 413 (citing *Gafford v. General Electric Co.,* 997 F.2d 150, 161 (6th Cir.1993).

**23.** The judicial determination of the issues in controversy may be reviewed *de novo. Id.* (citing *Greater Detroit Resource Recovery Auth. v. EPA,* 916 F.2d 317, 319 (6th Cir.1990)).

**24.** *See also City of Detroit Pension Fund v. Prudential Sec. Inc.,* 91 F.3d 26, 29 (6th Cir. 1996) (when Congress "vests in an administrative agency exclusive jurisdiction over any [particular] claims . . . failure to exhaust administrative remedies generally bars judicial review") (discussing *Pennsylvania R.R. Co. v. Day,* 360 U.S. 548, 79 S.Ct. 1322, 3 L.Ed.2d 1422 (1959)); *Rosa v. RTC,* 938 F.2d 383, 395 (3d Cir.1991) ("Congress made this statutory exhaustion requirement [under the FIRREA] explicitly jurisdictional."); *Townsend v. United States Dept. of Justice (INS),* 799 F.2d 179, 181 (5th Cir.1986) ("When exhaustion is stat-utorily mandated, the requirement is jurisdictional."), *quoted in Meliezer,* 952 F.2d at 882.

**25.** Subsection 1821(d)(13)(D) states:

Except as otherwise provided in this subsection [which delineates the administrative procedure for claims by creditors against the RTC], no court shall have jurisdiction over—
(i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or
(ii) *any claim relating to any act or omission of such institution or the Corporation* as receiver.
(Emphasis added.)

**26.** The Sixth Circuit has not ruled on whether all claims against the RTC for its acts as a receiver (despite whether those acts are effec-

## 1

The present case involves a claim against the RTC for its own acts in connection with the transfer of one of its assets approximately four years after it received the asset.[27] By that time, the standard administrative claims process for the failed institution had long since ended.

■ The text of the statute leaves no doubt that the exhaustion requirement applies to post-receivership claims for pre-receivership conduct. At the same time, it has been held that exhaustion is not mandated for pre-receivership claims for pre-receivership conduct. See, e.g., Damiano v. FDIC, 104 F.3d 328 (11th Cir.1997) (statute gives option to RTC at time of receivership to proceed judicially or administratively and if agency relies upon administrative remedies, it must request a stay of court proceedings). The different question that is presented here is whether the administrative structure applies to a third category of claims (to wit, post-receivership claims for post-receivership conduct that is, for all practical purposes, independent of the failed institution's acts).

## 2

The United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") appears to be in the minority in holding that the exhaustion requirement of the FIRREA does not apply to those claims that pertain to independent, post-receivership acts of the RTC. In Homeland Stores, Inc.

v. RTC, 17 F.3d 1269 (10th Cir.1994), the court considered whether a claim that arose out of the RTC's post-receivership management of an asset was subject to the statutory requirement.[28] Although the defendant argued that these claims were barred because the plaintiff had failed to pursue and exhaust administrative remedies, the court disagreed.[29]

At the outset, the Tenth Circuit emphasized that, as a matter of statutory construction, an effort should be made to place the language in context and view the statute as a whole. See id. at 1273. "In this vein [the court] note[d] that § 1821(d)(13)(D) ... is one part of an integrated administrative claims process under [the] FIRREA outlined in § 1821(d)(3)–(13). In fact, the jurisdictional ban in § 1821(d)(13)(D) is expressly tied to the remainder of the administrative claims process." Id. Hence, "the 'claims' barred by § 1821(d)(13)(D) [should be read] to parallel those contemplated under [the] FIRREA's administrative claims process laid out in the greater part of § 1821(d)." Id. at 1274.

The Homeland Stores court found it evident "that in requiring administrative review—and in the meantime forbidding federal court jurisdiction—of 'claims,' Congress had in mind creditor and related claims arising before an institution enters receivership." Id. Special note was taken of § 1821(d)(3)(B).[30] Under that subsec-

tively independent of the conduct and affairs of the failed institution) must first be heard in the administrative process or not at all. Other federal appellate and district courts have provided diverging guidance on the issue.

27. The instant claim is not against the RTC in its role as a successor. Rather, the Plaintiff seeks a remedy for an act that was committed by the RTC solely as a result of an allegedly improper management decision that occurred long after the time for asserting claims through the initial administrative process had expired.

28. The RTC had received a failed institution that owned a shopping center. Homeland Stores, Inc. was a significant tenant in the

center who had special contractual rights to approve of the occupant of another large rental space therein. Ultimately, the RTC decided to rent the other space to one of the plaintiff's competitors, and Homeland sued for money damages and injunctive relief. See id. at 1270–71.

29. The court stated that if it were to interpret "§ 1821(d)(13)(D) in a vacuum [it] might agree [with the RTC]." Id. at 1273.

30. Subsection (B) provides:

The receiver, in any case involving the liquidation or winding up of the affairs of a closed depository institution, shall—

tion, the deadline for filing claims might well have passed by the time the RTC engaged in any number of potentially miscreant acts. *See id.* (citing § 1821(d)(5)(C), which requires disallowance of any claim not filed before the § 1821(d)(3)(B) deadline except in very limited circumstances). Claims "arising after receivership and in the indeterminate future due to management actions of the RTC cannot have been contemplated when such deadlines for filing administrative claims were set."[31] *Id.* In short, the court concluded that Congress did not intend to require plaintiffs to file claims under a process that had closed before the claim arose, and § 1821 would not be read to force this anomalous result.[32]

### 3

On the other hand, a majority of courts have concluded that the exhaustion requirement applies even though a claim might not have matured until long after the bar date has passed. The United States Court of Appeals for the Third Circuit initiated this line of cases with its opinion in *Rosa v. RTC*, 938 F.2d 383 (1991). There, a failed institution main-

tained an employee benefit plan. After the RTC received the institution, it terminated the plan, and a former employee of the institution sued to recover benefits. The court held that the plaintiff's failure to exhaust administrative remedies barred any post-receivership relief. *See id.* at 392–93.

The argument received a more extended treatment in *Stamm v. Paul*, 121 F.3d 635, 640 (11th Cir.1997). There, the Eleventh Circuit weighed the merits of the arguments in *Rosa* and *Homeland Stores* and decided to squarely endorse the opinion by the United States Court of Appeals for the First Circuit ("First Circuit") in *Heno v. FDIC*, 20 F.3d 1204, 1208–09 (1994). The *Stamm* court initially identified an arguable statutory ambiguity concerning the administrative review schedule. Although most claims must be heard promptly after receivership, an exception exists when a "claimant did not receive notice *of the* appointment of the receiver in time *to file* such claim before such date." 12 U.S.C. § 1821(d)(5)(C)(ii)(I), *cited in Stamm*, 121 F.3d at 641, and *Heno*, 20 F.3d at 1209.

---

(i) promptly publish a notice to the depository institution's creditors to present their claims, together with proof, to the receiver by a date specified in the notice which shall be not less than 90 days after the publication of such notice; and

(ii) republish such notice approximately 1 month and 2 months, respectively, after the publication under clause (i).

**31.** The *Homeland Stores* court cited other cases in support of the proposition that, to be barred by § 1821(d)(13), a claim must be presentable under the claims process. *See RTC v. Midwest Fed. Sav. Bank*, 4 F.3d 1490, 1497 (9th Cir.1993) (affirmative defenses are not subject to exhaustion requirement since it would be patently absurd to require "presentment and proof to the RTC of all potential affirmative defenses that might be asserted in response to unknown and unasserted claims or actions by the RTC") (citations omitted); *Heno v. FDIC*, 996 F.2d 429, 433–34 (1st Cir.1993) (refusing to apply § 1821(d)(13)(D) exhaustion requirement to § 1821(e) contract repudiation claim where "it need not (indeed could not) have been filed prior to the ... bar date since the FDIC did not repudiate the

Bank's agreement with Heno until almost six months after the bar date").

The United States Court of Appeals for the Eleventh Circuit ("Eleventh Circuit") has criticized this reliance on *Heno*, 996 F.2d 429, because the opinion has been withdrawn and replaced. In fact, the superceding *Heno* opinion served as a precursor to the decision by the Eleventh Circuit in *Stamm v. Paul*, 121 F.3d 635, 640 n. 6 (1997), wherein the court declined to adopt the *Homeland Stores* rationale.

**32.** The court further noted that, were it to hold otherwise, "Homeland would have neither an administrative nor a judicial forum for the claims. Such an outcome raises constitutional problems." *Id.* n. 5 (discussing *Coit Independence Joint Venture v. FSLIC*, 489 U.S. 561, 579, 109 S.Ct. 1361, 103 L.Ed.2d 602 (1989)). This result would not be "consistent with the intent of Congress ... to be responsive to the constitutional concerns raised ... in *Coit* ... in formulating the FIRREA claims process." *Id.* (citing H.R.Rep. 101–54(1), at 418 (1989), *reprinted in 1989* U.S.C.C.A.N. 86, 214).

The FDIC had contended that even if the claimant had received notice of the agency's appointment, such a notice could- not be "in time" to file claims that did not arise until much later. In keeping with this interpretation, the FDIC maintained a policy of allowing the submission of late-arising claims for administrative review. *Stamm*, 121 F.3d at 640–41. Although the court recognized that the FDIC presented a viewpoint that "was far from the most natural reading" of the subsection, *id.* at 641 (quoting *Heno*, 20 F.3d at 1209) (internal quotation marks omitted), it refrained from finding the interpretation to be impermissible. The majority of courts have resolved the issue in a similar manner.[33]

4

The instant case is distinguishable from the majority. No express mention has been made of an administrative procedure for late-arising claims. Rather, the RTC contends that since the Plaintiff's claim was not submitted promptly after the commencement of the receivership, it cannot be heard in any court. However, by the time Lopez–Flores's claim had accrued, the ninety day period had expired. The Court agrees with the rationale in *Homeland Stores;* to wit, that the RTC's argument, if adopted, would produce an absurd result and raise constitutional problems because it would leave Lopez–Flores without any forum for his claim. *See Homeland Stores,* 17 F.3d at 1274 n.

5. Accordingly, the Defendant's argument is rejected.

Moreover, even if the broad statements in the RTC's filings are read to incorporate the argument that post-receivership claims are reviewable under the agency's internal regulations, a different result does not follow. The RTC has argued in prior cases that 12 U.S.C. § 1821(d)(5)(C)(ii)(I) is ambiguous, and therefore the statute may read to provide that late-arising claims can be considered under an internal procedure. This contention belies clear statutory language to the contrary, as well as the legislative history. The statute is not ambiguous, as discussed below, but rather it is straightforward and consistent with the remainder of subsection (d), which addresses creditor claims against a failed institution. The agency's interpretation is not entitled to deference—at least not the degree of deference that is sought—and it will not be accepted.

Section 1821(d)(5)(C)(i), (ii)(I) provides that claims that are filed after the bar date shall be disallowed on account of untimeliness and will not "be considered by the receiver [unless] ... the claimant did not receive notice of the appointment of the receiver in time to file such claim before such date...." Despite the terms of this statute, the RTC has contended that even when a claimant received notice of the appointment significantly prior to

**33.** In *FDIC v. Scott,* 125 F.3d 254 (1997), the United States Court of Appeals for the Fifth Circuit joined the majority. The question was whether a litigant could assert a counterclaim for indemnification against the FDIC where the underlying complaint was filed more than four years after the failed institution went into receivership. The court seized on the FDIC's contention that the agency "has an internal claims procedure that allows claimants to file 'late claims' that arise after the bar date." *Id.* at 259. Looking to the *Heno* decision, in which the First Circuit relied upon *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the *Scott* court applied the settled principle that when an agency's governing statute is silent or ambiguous on an issue, the government's interpreta-

tion is accorded substantial weight if it is based upon a reasonable construction of the legislation. *See* 125 F.3d at 259 (citing *Heno*, 20 F.3d at 1208–09). Accordingly, the court "defer[red] to the FDIC's reasonable interpretation of [the] FIRREA as requiring administrative exhaustion even for post-bar date claims." *Id.* at 259.

*See also Prieto v. Standard Fed. Sav. Bank,* 903 F.Supp. 670 (S.D.N.Y.1995) (accepting agency interpretation that late-arising claim could be filed where claimant brought both pre- and post-receivership claims); *Silva Bros. Inv. Inc. v. FDIC,* 894 F.Supp. 42 (D.Mass.1995) (plaintiff who, despite being given fresh opportunity by FDIC to file claim, did not do so could not invoke power of federal courts).

"such date," subsection (C)(ii) still applies to permit consideration of a late submission. Clearly, however, it is not the notice that fails to arrive on time; it is the claim. Although the Court agrees with the *Heno* and *Stamm* courts that the agency's view is far from the natural reading of the statute, it cannot concur that such an interpretation is permissible. *See also Carlyle Towers Condominium Assoc. v. FDIC*, 170 F.3d 301, 306 (2d Cir.1999) (refraining from addressing whether agency's interpretation was permissible) (The agency's "interpretation, although difficult to reconcile with the statute, affords late-filing claimants a forum in which their claims might be heard and thus seemingly expands the administrative review available to claimants.").

 The issue of whether an agency's interpretation of its governing statute is permissible and entitled to deference is generally controlled by *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).[34] There, the Court set forth a straightforward analysis for the federal courts:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.[35] If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative inter-

---

**34.** Although the *Chevron* analysis is the lynchpin of the majority opinions, it is questionable whether, and to what degree, it should be applied to the instant case. The *Chevron* Court's opinion addresses agency regulations that fill gaps left inside the boundaries of the subject matter of a statute. 467 U.S. at 844, 104 S.Ct. 2778. While gap-filling activities can permissibly increase the depth of the penetration of the statute into the affairs that were intended to be regulated, *id.* at 844–45, 104 S.Ct. 2778, they should not expand the scope of an agency's authority into the external universe of topics that Congress neglected or purposefully omitted. *See generally Merck & Co. v. Kessler*, 80 F.3d 1543, 1549–50 (Fed. Cir.1996) (distinguishing *Chevron* and holding that Patent and Trademark Office's regulatory interpretation was not entitled to deference where it exceeded the agency's statutory authority); *Doe v. Reivitz*, 830 F.2d 1441, 1446 (7th Cir.1987) (contrasting legislative rules that are subject to *Chevron* (to wit, rules "reasonably related to the purposes of the legislation, promulgated through proper procedures and not arbitrary or capricious") with mere interpretive documents that are not entitled to deference).

For example, in *Chevron*, the EPA had been empowered to vigorously enforce federal laws that controlled the amount of air pollutants that could be emitted. The Court deferred to the agency's interpretation of what would be viewed as a polluting unit for the purposes of ensuring that each unit maintained or de-

creased its pollutant emission levels, as required by law. This regulation was squarely within the subject matter of the underlying statutes. *See* 467 U.S. at 845–53, 865, 104 S.Ct. 2778. By contrast here, Congress instituted a regulatory system to restructure the savings and loan industry and to handle claims by creditors against failed institutions. It gave the RTC, among other agencies, the power to receive the institutions and liquidate the pre-receivership claims against them. At the same time, it provided that the RTC would be subject to the APA for its own actions. When the agency interprets the FIRREA as giving it the power to resolve post-receivership claims against it for its own independent actions, it oversteps the authority that has been granted to it, and its interpretation is not entitled to *Chevron* deference.

*Cf. 1185 Avenue of the Americas Assocs. v. RTC*, 22 F.3d 494, 497 (2d Cir.1994) (RTC's interpretation should not receive "full *Chevron* deference" because there are other agencies that administer the FIRREA).

**35.** (Original footnote 9) (citations omitted). The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

pretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842–43, 104 S.Ct. 2778.

As to the first question, this Court finds that Congress has spoken on the issue, and the RTC's argument is not entitled to deference. *See Walton v. Hammons,* 192 F.3d 590, 601 (6th Cir.1999) ("Because the 'traditional tools of statutory construction' have allowed us to derive a clear meaning to the statute, the USDA statements interpreting the food stamp provisions consistent with our reading are not relevant to our holding, and therefore receive no *Chevron* deference.") (citing *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)); *Director, Office of Workers' Comp. Programs, United States Dept. of Labor v. Sun Ship, Inc.,* 150 F.3d 288, 291 (3d Cir.1998) (Deference

is warranted "only when the statute does not directly speak to the issue and congressional intent cannot be gleaned from the text of the statute, or its legislative history."); *Wagner Seed Co. v. Bush,* 946 F.2d 918, 920 (D.C.Cir.1991) ("The controlling principle of *Chevron* is that when the statute, viewed in light of its legislative history and the traditional tools of statutory construction, is ambiguous, the administering agency is entitled to make 'a reasonable policy choice.' "). Section 1821(d)(5)(C)(ii)(I) is not ambiguous. The clear function of the provision is to allow a claimant who has a pre-receivership claim, but who was unaware of the receivership, to assert the claim. This reading accords with the unilateral legislative history and the correct observation by the *Homeland Stores* court that, in enacting § 1821(d), it was the intention of Congress to provide an efficient means of resolving creditor claims that arose prior to receivership.[36] Indeed, the section was passed in response

36. *See* H.R.Conf.Rep. No. 101–222, at 397 (1989), *reprinted in* 1989 U.S.C.C.A.N. 432, 436 ("Title II establishes the manner of conduct of a conservatorship or receivership of an insured depository institution under Federal law. The FDIC is granted rulemaking authority with respect to this subject. The title sets forth in detail *the claims procedures that apply with respect to claims against institutions in liquidation.* These procedures allow a claimant, after an initial agency determination, the choice of pursuit of judicial adjudication or with the consent of the agency, administrative review.") (emphasis added); H.R.Conf.Rep. 101–209, at 399 (1989) (same); H.R.Conf.Rep. No. 101–54(I), at 419 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 215 ("The claims determination procedure ... enables the FDIC to dispose of the bulk of *claims against failed financial institutions* expeditiously and fairly.... Thus, the claim resolution process established in this section should allow the FDIC to quickly resolve many of the *claims against failed financial institutions* without unduly burdening the District Courts.") (emphasis added).

For related authority, see generally H.R.Conf.Rep. No. 101–222 (1989), *reprinted in* 1989 U.S.C.C.A.N. 432 (referring throughout to the agency as "the liquidating agent," and implying that the claims to be covered by the process were ones contemplated in liquidation (to wit, claims arising out of the con-

duct or affairs of the failed institution)); 135 Cong.Rec. S6940, S6942 (daily ed. Tuesday, June 20, 1989) ("The FHLBB also appoints FSLIC as receiver, a separate and distinct legal entity, for the purposes of liquidating a failed institution. Once the FHLBB decides to close a savings and loan and appoints FSLIC as receiver, FSLIC's duties as receiver include taking legal and physical possession, collecting obligations due, disposing of assets, and *settling claims against the savings and loan asociation* [sic].") (letter to Sen. Pryor on behalf of the General Accounting Office by Barry L. Unger, Director, Federal Human Resource Mgmt. Issues) (emphasis added).

Two additional points merit observation when interpreting the above history of the banking bill in the House of Representatives. First, the Senate straightforwardly adopted the House's version of the claims process. *See* Misc. Conference Comm. Materials, Arnold & Porter Legis.Hist., P.L. 101–73, Material 72, ¶ 26. ("Accept the House provision describing claims process in receiverships conducted by FDIC and RTC. The House provision provides for a specific claims procedure, with deadlines for creditors and the FDIC, to be followed in cases where the FDIC (and the RTC) is appointed receiver. The Senate proposal adopts the House provision.") Second, after a thorough search of the legislative history of the FIRREA, the

to the Supreme Court's decision in *Coit Independence Joint Venture v. FSLIC,* 489 U.S. 561, 109 S.Ct. 1361, 103 L.Ed.2d 602 (1989) (creditor who brought pre-insolvency claim, but failed to utilize administrative process, was not precluded from bringing federal lawsuit because process did not prescribe reasonable time limits for administrative adjudication). However, although the decision in *Coit* and the pertinent legislative history contain definitive statements about the goal of resolving pre-insolvency claims, neither include an indication that any other claims were contemplated.[37] Finally, the directive by Congress that the agencies administering the claims process shall be subject to the APA for their actions suggests that the legislature intended for the judiciary to review claims against the agencies for their independent actions.[38]

 Moreover, even if this Court were to reach the second prong of the *Chevron* analysis, the RTC would not prevail in its dispositive motion. In *Chevron,* the Supreme Court addressed the power of an agency to fill statutory gaps that have been explicitly or implicitly left to the agency's discretion. 467 U.S. at 844, 104 S.Ct. 2778. Where Congress intends that a gap should be filled by the agency, administrative regulations will be reviewed under an arbitrary or capricious standard. "[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* By the same token, where the agency's interpretation is unreasonable or contrary to law, it will not prevail. In the instant case, this Court has found that the RTC's interpretation contradicts the terms of the statute and is inconsistent with the legislative history. There is no support for the contention that Congress explicitly or implicitly intended for the RTC to have the type of

Court was unable to find any statement that could be construed as affirmatively supporting the RTC's interpretation of the statute. Apparently, no member of Congress quarreled with the proposition that the claims process was intended simply to address pre-receivership claims against the failed institutions.

37. *See Section–by–Section Analysis of S. 774: The Financial Institutions Reform, Recovery, and Enforcement Act of 1989,* 135 Cong.Rec. S6907, S6912 (daily ed. Monday, June 19, 1989) ("New subsection (1) authorizes the FDIC to adopt administration procedures for determining claims against an institution in receivership, under which a contested claim will be decided by an independent administrative law judge and that judge's decision will be subject to judicial review. This approach is intended to deal satisfactory with the statutory and constitutional issues recently analyzed by the Supreme Court in *Coit Independence Joint Venture v. Federal Savings and Loan Insurance Corporation.*") (report introduced by Sen. Riegle); H.R.Conf.Rep. No. 101–54(I), at 419–19 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 214–15 ("The claims determination procedure ... meets the concerns raised by the *Coit* case ...."); Arnold & Porter Legis.Hist., P.L. 101–73, Material 46, at 126 ("The claims adjudication process set forth in [the FIRREA] is intended to facilitate the resolution of judicial claims against a failed institution in light of the Supreme

Court's decision in *Coit;* it in no way was intended to affect a claimant's ability to pursue any nonjudicial remedies it might have against a failed institution."); *First City, Tx.— Beaumont, N.A. v. Treece,* 848 F.Supp. 727, 740–41 (E.D.Tex.1994) (noting that 12 U.S.C. § 1821(d) is Congress's effort to address and supercede the *Coit* Court's decision; the section "now provides that anyone wishing to assert a *claim against a failed institution* must present their claim to the FDIC in accordance with the procedures set out in that section.") (emphasis added).

38. In a broader sense, this interpretation is consistent with the motivation behind the FIRREA; namely, to address the financial turmoil that was left in the wake of corporate recklessness, corruption and abuse. *See* H.R.Rep. No. 101–54(I), at 299–302 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 95–98 (discussing poor management, insider abuse, fraud, and inadequate supervision of financial institutions). When enacted, the administrative claims process balanced the goals of efficiency and equity to provide an effective means to resolve that turmoil. However, the procedure did not, and was not intended to, address the late-arising, independent failures of the administrative agency itself. There is simply no evidence that Congress foresaw this circumstance or meant for the section to cover it.

discretion that it seeks to acquire in this case over the Plaintiff's post-receivership claims. Therefore, the agency's regulation is not a reasonable interpretation of the statute. Accordingly, the interpretation is impermissible and is not entitled to deference.

■ In addition, the Court concludes that the administrative process of § 1821 does not cover claims that arise after receivership from the independent acts of the governmental agency. Rather, such acts may be brought before the judiciary under the APA prior to any administrative review. Although the claimant may submit his claim to the agency for administrative review, he is not required to do so. Accordingly, the RTC's motion to dismiss for lack of subject matter jurisdiction is denied.

## IV

■ The RTC has also argued that under 12 U.S.C. § 1821(d)(6)(A) venue in this case should lie in Texas, where the failed institution had its principal place of business, or in Washington, DC. Section 1821(d)(6)(A) provides that within a specified time period:

the claimant may request administrative review ... or file suit on such claim (or continue an action commenced before the appointment of the receiver) in the district or territorial court of the United States for the district within which the depository institution's principal place of business is located or the United States District Court for the District of Colum-

bia (and such court shall have jurisdiction to hear such claim).

However, this section, like § 1821(d)(13)(D), applies to those claims that are susceptible to the administrative process under subsection (d). For the same reasons that subsection (d)(13)(D) does not apply to bar the claims here, subsection (d)(6) does not prescribe the appropriate venue.

The Plaintiff's residence is in Detroit, Michigan. Accordingly, this Court is an appropriate venue for his claims. The RTC's motion for a transfer of this case is denied.

## V

As a final matter, it has been disputed whether, as a matter of fact, the RTC refused to recognize a certificate of deposit for five thousand dollars ($5,000.00) and failed to follow proper procedures in transferring that certificate.[39] However, uncontroverted evidence has been submitted, which reveals that the certificate in question was promptly and suitably paid.[40] Accordingly, the Plaintiff cannot prove his claim. The RTC's motion seeking dispositive relief on this portion of the Plaintiff's claims is granted, and a summary judgment[41] thereupon will be entered.

## VI

In summary, the RTC's motion to dismiss this case for lack of subject matter jurisdiction is denied. The Plaintiff's claims are not of the sort that are contemplated by the administrative process under the FIRREA and, thus, they are not sub-

**39.** Compl. ¶¶ 22–24.

**40.** In a supplemental brief, the RTC submitted copies of the certificate of deposit which bears the number 3617989, as well as a check issued by the RTC on July 14, 1991 in the amount of $6,038.81. (Def.'s Supp.Br.Exs. A, C.) The check was payable to the Plaintiff and referenced account number 3617989. It has been contended, and no contrary argument has been maintained, that the check represented a full and final payment of the certificate of deposit.

**41.** The request for dismissal of the claim by the RTC was converted into a request for summary judgment upon the consideration of additional evidentiary materials. *See* Fed. R.Civ.P. 12(b). The entry of a summary judgment is appropriate where, as here, there is no genuine issue of a material fact, and the moving party is entitled to the entry of a judgment as a matter of law. *See* Fed. R.Civ.P. 56(c).

ject to its exhaustion requirement. The motion to transfer venue, which arises out of a statute that relates to the same claims procedure, is likewise denied. Nonetheless, there is no genuine issue of a material fact that a contested certificate of deposit has been properly paid. Accordingly, a summary judgment shall enter against the Plaintiff's request for payment of the certificate.

IT IS SO ORDERED.