United States Court of Appeals,

Eleventh Circuit.

No. 96-4177.

Warren J. STAMM, Receiver.

CenTrust Savings Bank, a savings and loan association organized under the laws of the USA, under conservatorship of the Resolution Trust Corporation, Plaintiff-Counter-Defendant-Appellee,

v.

David L. PAUL, Sandra R. Paul, Defendants-Counter-Claimants-Appellants,

Geomatic Designs, Incorporated, The George Hyman Construction Company, M. Ecker & Company of Florida, Incorporated, Miami Beach Awning Company, La Gorce Island Association, Incorporated, Robert Sasso, Jack Logan Wilson, Blackwell Plumbing, et al., Defendants.

Sept. 9, 1997.

Appeal from the United States District Court for the Southern District of Florida. (No. 90-1052-CIV-DLG), Donald L. Graham, Judge.

Before EDMONDSON, Circuit Judge, and KRAVITCH and WOOD[*], Senior Circuit Judges.

KRAVITCH, Senior Circuit Judge:

David L. Paul and Sandra R. Paul (collectively, "the Pauls") appeal the district court's orders granting: (1) final judgment to the Resolution Trust Corporation ("RTC") on its claim for foreclosure of the Pauls' residential mortgage; and (2) summary judgment to the RTC on the Pauls' counterclaims for trespass, breach of contract and deprivation of due process.[1] As to the first order, the Pauls contend that the district court reversibly erred when it ruled that the RTC complied with the conditions precedent of the mortgage upon which it sought to foreclose. For their second assignment of error, the Pauls argue that the district court mistakenly determined that it lacked jurisdiction over the Pauls' countersuit based on the Pauls' failure to exhaust administrative remedies

---

[*]Honorable Harlington Wood, Jr., Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

[1]The RTC filed this suit for the nominal plaintiff and defended against the Pauls' counterclaims. Although the RTC's statutory authority expired during this litigation, and the Federal Deposit Insurance Corporation formally succeeded to the RTC's interest in ongoing cases, 12 U.S.C. § 1441a(m)(1), for clarity, we refer to the plaintiff/counter-defendant-appellee as the RTC.

as required by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA" or "the Act"), Pub.L. No. 101-73, 103 Stat. 183 (codified as amended in scattered sections of 12 U.S.C.). They insist that late-arising, post-receivership claims, such as they have asserted in this case, fall outside the reach of the RTC's administrative review process. We reject the Pauls' arguments on both points and affirm the orders of the district court.

## I.

The following facts are undisputed: David Paul chaired the board of directors of CenTrust Bank when it failed in 1990. At that time, CenTrust Bank held a $6,000,000 mortgage on the Pauls' residence. In response to CenTrust Bank's difficulties, the Office of Thrift Supervision set up a plan which transferred some of CenTrust Bank's assets and liabilities, including the Pauls' mortgage, to the newly-created CenTrust Federal Savings Bank which the RTC superintended. During this reorganization, the Pauls failed to make a required payment on their mortgage. Pursuant to the terms of the mortgage agreement, the mortgagee (by succession, the RTC) had the right to protect the value of the property; however, pending an acceleration of the mortgage upon notice to the Pauls of their right to cure the default, the RTC could not take possession of the property unless the Pauls abandoned it. At some point prior to or during the 30-day, right-to-cure interval, the Pauls moved out of the residence, but during all relevant times they continued intermittently to enter the property and to maintain service personnel on site. After the Pauls' default, but before the expiration of the right-to-cure period, the RTC hired security guards to patrol both the street in front of and the waterfront behind the residence.

## II.

The RTC filed suit against the Pauls seeking to foreclose upon their residential mortgage; the Pauls countersued for trespass, breach of contract and deprivation of due process. The RTC moved for summary judgment on the Pauls' counterclaims. The district court orally granted that motion before the case went to trial. After a bench trial, the district court received proposed findings of fact and conclusions of law and, thereafter, entered final judgment in favor of the RTC on its

2

foreclosure claim. The district court then memorialized by written order its prior oral disposition of the counterclaims. This appeal followed.

The district court's conclusions of law and findings of fact underlying its order of final judgment for the RTC on the foreclosure claim are subject to *de novo* and clear error review, respectively. *See, e.g., National Shipping Co. of Saudi Arabia v. Omni Lines, Inc.,* 106 F.3d 1544, 1545 (11th Cir.1997). The district court's grant of summary judgment against the Pauls on their counterclaims due to their failure to exhaust administrative remedies raises a question of subject matter jurisdiction that we examine *de novo. See McMillian v. Federal Deposit Ins. Corp.,* 81 F.3d 1041, 1045 (11th Cir.1996). In this light, we consider the two distinct aspects of the Pauls' appeal.

## A.

The Pauls argue that the district court erroneously granted final judgment to the RTC on its foreclosure claim. They base this contention on the assertion that the RTC failed to satisfy the conditions precedent of the mortgage agreement as usually required for a foreclosure action under Florida law. *See generally Voght v. Galloway,* 291 So.2d 579, 581 (Fla.1974).[2] Specifically, the Pauls maintain that the RTC's agents entered the property in question prior to the end of the right-to-cure period, and that the RTC, thereby, "breached the express terms of the loan documents, barring its recovery in the foreclosure action."[3] The RTC denied that it violated the terms of the mortgage contract and the district court agreed.

The Pauls' argument on this point revolves around the conduct of certain security guards. The district court determined that the RTC hired the security personnel in question to patrol *outside* the Pauls' residence for the contractually allowed purpose of protecting the property. It also found

---

[2]The RTC properly instituted this suit in federal court, *see* 12 U.S.C. §§ 1819; however, except in limited instances, state law continues to govern the determination and vindication of the rights the RTC has inherited from failed financial institutions, *see O'Melveny & Myers v. Federal Deposit Ins. Corp.,* 512 U.S. 79, 86, 114 S.Ct. 2048, 2054, 129 L.Ed.2d 67 (1994). Accordingly, the parties do not contend that federal decisional rules apply to the RTC's foreclosure claim; instead, they agree that the substantive law of Florida controls.

[3]Appellants' Br. at 26.

3

that the RTC expressly had directed the guards with whom it contracted not to trespass at the Pauls' residence during the relevant period of time. The record reveals no clear error as to these factual findings by the district court and we detect no legal error in its construction of the mortgage agreement.[4]

The Pauls point out that at least one guard under contract with the RTC actually entered onto the residential compound. The district court indeed found that one member of the waterfront security patrol retained by the RTC wrongfully tied his boat to the Pauls' dock and fell asleep on their property. As the district court noted, however, the record indicates that the individual in question so acted against the RTC's direct instructions. As a result, the district court refused to impute to the RTC that trespass. The Pauls insist that *Davis v. Charter Mortgage Co.,* 385 So.2d 1173 (Fla.App. 4th Dist.1980), makes the RTC liable for the guard's conduct. They further argue that, as the party responsible for the trespass, the RTC breached the mortgage contract and, thereby, lost the right to foreclose.

Assuming, *arguendo,* that such a nominal breach of a mortgage contract as that alleged by the Pauls would impair a mortgagee's right to seek foreclosure under Florida law, we still reject the Pauls' assignment of error on this point. The *Davis* court declared that, in this context, a principal may be charged with the unauthorized acts of an independent contractor only if she "is hired to do an act that constitutes a tort...." *Id.* at 1174. The RTC contends that because it explicitly directed the security personnel at issue to remain off the mortgaged property, it cannot be found to have hired them to commit an act that would qualify as a trespass or some other related tort. The RTC insists that, therefore, it has no derivative liability under *Davis*. We agree. The Pauls make much of the

---

[4]The fact that the security detail that the RTC engaged ultimately may have failed to prevent damage to the Pauls' residence does not convert the RTC's decision to retain the guards into a violation of the mortgage agreement. The provision of the contract at issue, read reasonably, authorized the RTC to take steps designed to protect the property; it did not condition the RTC's right to act upon its ability to make a future showing that its efforts succeeded. Given that the RTC could not take full control over the premises at the relevant time, we conclude that its posting of guards constituted a good-faith effort to protect the property, as permitted by the mortgage agreement.

district court's description of the guards' presence outside the residence as "somewhat intimidating and intrusive in nature," *CenTrust Fed. Savings Bank v. Paul,* No. 90-1052-CIV-Graham, slip op. at 16 (S.D.Fla. July 12, 1995), but they have failed to identify any evidence that would indicate that the RTC engaged the security personnel to perform an act that constituted a tort.[5]

The foregoing analysis leads us to conclude that the RTC did not breach its mortgage agreement with the Pauls. In light of that conclusion, we discern no error by the district court as to its order of foreclosure in favor of the RTC.

B.

In response to the RTC's complaint in this case, the Pauls countersued for trespass, breach of contract and deprivation of due process. The district court ruled that it could not entertain those counterclaims because the Pauls had failed to exhaust the relevant, statutorily-mandated, administrative process. Resolution of the Pauls' challenge to this holding requires a close examination of certain of FIRREA's provisions.

In enacting FIRREA, Congress anticipated that, as a receiver for failed lending entities, the RTC would face numerous claims from various parties. Accordingly, it sought to reduce the volume of formal litigation that otherwise would have resulted by providing for administrative review of such claims by the RTC before judicial proceedings could commence. *See* 12 U.S.C. §§ 1821(d)(3)-(13). The Act's exhaustion proviso applies to:

> (i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the [RTC] has been appointed receiver, including assets which the [RTC] may acquire from itself as such receiver; or
>
> (ii) *any claim relating to any act or omission of* such institution or *the [RTC] as receiver.*

12 U.S.C. § 1821(d)(13)(D) (emphasis added). This court has held that this "statutory exhaustion requirement [ ] *generally* applies to post-receivership as well as pre-receivership claims." *Damiano v. Federal Deposit Ins. Corp.,* 104 F.3d 328, 333 (11th Cir.1997) (emphasis added). In this case,

---

[5]As a result, even if we construed the record to support an inference that the guards in question committed other technical trespasses during the relevant time period, the RTC would have incurred no vicarious liability for such incidents.

we must determine whether FIRREA's administrative exhaustion prerequisite, *generally* applicable to post-receivership claims, bars the Pauls' *particular,* post-receivership claims.

Post-receivership claims encompass at least two rough classes: (1) claims related to conduct by the failed financial institution that the aggrieved party neglects to assert until after the RTC assumes control over the lending entity; and (2) claims based on the RTC's actions *as receiver.* The Pauls' counterclaims fall in the second category. This court recently recognized a split in the circuits on the question of whether the Act's exhaustion requirement applies in such cases, but reserved decision of the issue. *See RPM Inv., Inc. v. Resolution Trust Corp.,* 75 F.3d 618, 621 & n. 3 (11th Cir.1996). Because this appeal turns upon that previously deferred question, we now must choose which line of authority to follow.

*Rosa v. Resolution Trust Corp.,* 938 F.2d 383 (3d Cir.), *cert. denied,* 502 U.S. 981, 112 S.Ct. 582, 116 L.Ed.2d 608 (1991), and *Homeland Stores, Inc. v. Resolution Trust Corp.,* 17 F.3d 1269 (10th Cir.), *cert. denied,* 513 U.S. 928, 115 S.Ct. 317, 130 L.Ed.2d 279 (1994), stand as the two key cases on point. In *Rosa,* the RTC, as receiver, terminated a benefit plan at a failed financial institution and an employee enrolled in the program sued without seeking relief through the RTC. The Third Circuit ruled that the jurisdictional bar underlying the exhaustion requirement precluded courts from entertaining the claim. *See Rosa,* 938 F.2d at 392-93. In *Homeland Stores,* the plaintiff held a commercial lease from a financial institution that forbade the lessor from renting adjacent space to competing retailers. When the lending entity failed, the RTC entered into a tenancy agreement with another business allegedly in violation of the first store's lease. The Tenth Circuit held that the lessee's failure to file a claim directly with the RTC did not bar a suit for breach of the lease because FIRREA's administrative scheme only enabled the RTC to deal with claims by creditors of failed financial institutions, not with claims based on the RTC's post-receivership conduct. *See Homeland Stores,* 17 F.3d at 1274-75.

The RTC objects to the Tenth Circuit's approach on the ground that it conflicts with the plain language of FIRREA's exhaustion provision, which explicitly refers to "any claim relating to any

act or omission of ... the [RTC] as receiver." 12 U.S.C. § 1821(d)(13)(D)(ii). The Tenth Circuit acknowledged that this passage appeared to encompass claims based on the RTC's alleged, post-receivership misdeeds, but it concluded that the administrative process set out elsewhere in the Act prevented the RTC from providing administrative review for claims based on its own actions as receiver. *See Homeland Stores,* 17 F.3d at 1274 & n. 5 (discussing FIRREA's time limits for filing administrative claims and noting that, because they essentially run from date the RTC becomes receiver, administrative claims based on the RTC's conduct as receiver often would be time-barred). The Pauls reiterate this argument. The RTC counters that it has construed FIRREA to allow it to address administratively such late-arising, post-receivership claims and that, therefore, the district court properly enforced the jurisdictional bar in the instant case.

In support of this contention, the RTC cites *Heno v. Federal Deposit Ins. Corp.,* 20 F.3d 1204, 1208-10 (1st Cir.1994) ("*Heno II* ") (deferring to the RTC's view that FIRREA authorized administrative review of late-arising claims).[6] In related, parallel litigation between David Paul and the RTC, this court cited the *Heno II* court's ruling that the RTC's internal procedures legitimately could accommodate these type of post-receivership administrative claims, but we disposed of that case on another ground in part because the RTC failed to clarify its position. *See Paul v. Federal Deposit Ins. Corp.,* 91 F.3d 110, 113 (11th Cir.1996) ("If the [RTC] had alerted us to regulations or a manual of procedures pertaining to [FIRREA's administrative claim schedule], these administrative provisions might have helped us understand how that section is relevant...."). Upon further review of FIRREA and the pertinent administrative materials, we now adopt the First Circuit's view that the

---

[6]The decision of the *Heno* case originally appeared at 996 F.2d 429 (1st Cir.1993) ("*Heno I* "). In *Heno I,* the First Circuit questioned whether FIRREA's administrative exhaustion requirement applied to post-receivership claims that arose beyond what it construed as the statutory bar date for administrative claims because such an approach might preclude both administrative and judicial review. The Tenth Circuit relied upon the *Heno I* court's analysis in *Homeland Stores.* The First Circuit, thereafter, withdrew *Heno I* and superseded it with *Heno II.* The district court correctly reasoned that the First Circuit's ultimate disposition of the *Heno* case undermined the persuasiveness of *Homeland Stores.*

RTC's policies grounded upon its construction of FIRREA provide the RTC a sufficient basis to review claims, such as the Pauls assert.

The Act states that the RTC "may, as receiver, determine claims in accordance with the requirement of this subsection and regulations prescribed [by the RTC]." 12 U.S.C. § 1821(d)(3). The cited subsection mandates that the RTC notify potential claimants by publication and mail that it will entertain accrued claims filed within 90 days of the notice. 12 U.S.C. §§ 1821(d)(3)(B)-(C). FIRREA further provides that "claims filed after the date specified in the notice published under the [above-cited subsection] shall be disallowed...." 12 U.S.C. § 1821(d)(5)(C)(i). Based on these portions of the Act, the *Homeland Stores* court held and the Pauls now contend that the RTC has no choice but to disallow as untimely claims, such as the instant counterclaims, that arise beyond the 90-day window that follows shortly after the RTC's appointment as receiver.

As the RTC points out, however, this view ignores an ambiguous exception to FIRREA's otherwise rigid administrative claims schedule. That exception refers, in pertinent part, to cases where a "claimant did not receive notice of the appointment of the receiver in time to file such claim before such date." 12 U.S.C. § 1821(d)(5)(C)(ii)(I). According to the Pauls, this exception pertains only to situations in which a claimant has notice of the RTC's appointment as receiver after the above-cited, 90-day administrative claims period has run. We agree with the RTC, however, that the language of the exception is too ambiguous to bear only the construction urged by the Pauls.

The RTC essentially has interpreted the phrase, "in time to file such claim," within the exception to mean "at a time when the claimant could have filed such a claim." According to the RTC, therefore, where, as here, a claim arises after the initial 90-day, claim-filing period, the claimant did not receive notice of the RTC's appointment at a time when he or she could have filed that claim and thus, the exception to the administrative bar date applies. We concur with the First Circuit's conclusion that although the RTC's "proposed interpretation is far from the most natural reading of subsection 1821(d)(5)(c)(ii) itself, we cannot say that it [fails to] represent a "permissible' reading of an ambiguous provision viewed in the broader context of the statute as a whole under the

8

deferential standard required by [*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782-83, 81 L.Ed.2d 694 (1984) ]." *Heno II,* 20 F.3d at 1209. Like the First Circuit, we draw support for our decision to accept the RTC's approach and the resulting expanded range of claims subject to administrative process from the fact that Congress explicitly delegated authority to the RTC to develop claims procedures and that it expressed a clear intent that the RTC and not the courts serve as the first line of review under FIRREA. *See id.*

At oral argument, the Pauls asserted that, regardless of the merits of the RTC's construction of FIRREA's administrative review scheme advanced in this case, the RTC previously had failed to inform potential claimants that it would entertain administrative claims related to its conduct as a receiver. As a result, the Pauls insisted that this court should not treat their counterclaims as subject to the administrative exhaustion requirement. The Pauls did not articulate this specific contention in their briefs and therefore, pursuant to well-established authority, we have no obligation to consider it. *See, e.g., Bigby v. United States Immigration and Naturalization* Serv., 21 F.3d 1059, 1063 n. 6 (11th Cir.1994). Notwithstanding this fact, we note that the Pauls' argument on this point lacks merit. To the extent FIRREA's provision that claimants should exhaust administrative remedies for "any claim relating to any act or omission of ... the [RTC] as receiver," 12 U.S.C. § 1821(d)(13)(D)(ii), insufficiently notified the Pauls that they had to present their claims to the RTC before seeking judicial relief, applicable administrative regulations and policy statements afforded them further guidance.

At the time the RTC allegedly committed the acts upon which the Pauls base their counterclaims (March and April of 1990), the regulations of the Federal Deposit Insurance Corporation ("FDIC"), which FIRREA made applicable to the RTC, *see* 12 U.S.C. § 1441a(a)(7), directed all claimants aggrieved by the actions of financial institution receivers to seek administrative relief before going to court. *See* 12 C.F.R. Pt. 393 (1990).[7] Moreover, on March 7,

---

[7]That regulation remained in effect until November 5, 1990, when the FDIC removed it as unnecessary in light of FIRREA's provisions mandating administrative exhaustion. *See* Removal of Regulations Transferred from Fed. Savings and Loan Ins. Corp., 55 Fed.Reg. 46495, 46496

1994, a date preceding the filing of the Pauls' countersuit in this case,[8] the RTC issued an Interim Statement of Policy Regarding Procedures To Be Used with Regard to Claims Based Upon Acts or Omissions of the Receiver, 59 Fed.Reg. 10663 (1994). In that statement, the RTC confirmed that it did not consider late-arising claims "to be subject to the published bar date for filing claims with the [RTC] as receiver and set[ ] forth the circumstances under which the [RTC] will consider these claims to be timely filed." *Id.* The RTC further indicated therein that claimants who do not receive notice from the RTC of a potential claim can file an administrative claim at any time up to 30 days after the RTC "publishes notice of its intention to terminate the receivership." *Id.* at 10664. *See also Heno II,* 20 F.3d at 1210 (appending RTC form designated "for claims discovered after expiration of the [administrative] bar date"). Accordingly, both when the acts underlying the counterclaims occurred and when the Pauls sought judicial relief, they had constructive notice, not only by statute, but also pursuant to administrative edict, that the RTC made such review available and that they should pursue it before filing suit.

In summary, then, we defer to the RTC's construction of FIRREA's provisions related to administrative claims. This decision alleviates the potential internal inconsistency within the Act that led the Tenth Circuit to look beyond the plain language of the jurisdictional bar. With that concern removed, we join the Third Circuit in holding that claimants, such as the Pauls, aggrieved by the actions of the RTC as receiver must exhaust their administrative remedies before they seek relief in court. The district court, therefore, properly granted judgment as a matter of law to the RTC on the Pauls' counterclaims because it lacked subject matter jurisdiction over them.

### III.

For all these reasons, the district court's orders of final judgment in favor of the RTC on its foreclosure claim and summary judgment on the Pauls' counterclaims are AFFIRMED.

_____

(1990).

[8]The Pauls moved for permission to file an amended answer containing the counterclaims at issue on March 7, 1994, but the district court did not grant that motion until April 5, 1994, at which time the counterclaims actually were filed.

10