# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-2412

_____

LNV Corporation

*Plaintiff - Appellee*

v.

Outsource Services Management, LLC, a Nevada limited liability company, doing
business as Presidium Asset Solutions; BF - Negev, LLC, a Minnesota limited
liability company

*Defendants - Appellants*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: May 9, 2017
Filed: August 28, 2017

_____

Before SMITH, Chief Judge, COLLOTON and KELLY, Circuit Judges.

_____

SMITH, Chief Judge.

LNV Corporation sued Outsource Services Management, LLC (OSM) to
recover its share of the sale proceeds of a promissory note. OSM counterclaimed
alleging that LNV owed OSM millions of dollars for loan advances that it paid for
LNV's benefit. OSM also asserted, as a defense to LNV's suit, that LNV's prior

breach of contract excused OSM's alleged breach. Additionally, LNV sued BF-Negev, LLC to recover its share of the sale of collateral under a separate agreement. BF-Negev, an OSM subsidiary, asserted that it was withholding LNV's share as a setoff against what LNV owed OSM. On summary judgment, the district court[1] held that (1) it lacked jurisdiction over OSM's counterclaim because OSM did not pursue an available and necessary administrative relief procedure before filing suit; (2) the OSM–LNV contract required OSM to pay LNV its net share of the sale despite LNV's prior breach; and (3) BF-Negev was not entitled to withhold LNV's share of the collateral. For the reasons given below, we affirm.

## I. *Background*
### A. *Lake Austin Loan*

In 2007, Marshall Financial Group, LLC funded a construction loan for a condominium complex in Florida (the "Lake Austin Loan") for $140 million. Columbian Bank & Trust Company of Topeka, Kansas ("Columbian") purchased a $6 million participation interest in the Lake Austin Loan. Columbian thus acquired a 4.28571429% stake in the financing investment. Columbian's participation interest was governed by a participation agreement (the "Lake Austin Agreement"). In the Lake Austin Agreement, Columbian agreed to fund its proportionate share of advances to the borrower and to reimburse Marshall for its share of expenses. Marshall in turn agreed to pay Columbian its share of loan collections.

Columbian paid its share of the first 23 advances to the borrower; these advances came to just under $3 million, or 2.12424110%, of the $140 million loan. In August 2008, though, Columbian became insolvent and went into FDIC receivership. The receiver set November 25, 2008, as the deadline to file claims related to Columbian's or the receiver's actions. *See* 12 U.S.C. § 1821(d)(3)(B).

---

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

In September 2008, soon after Columbian went into receivership, Marshall made another advance to the borrower and asked Columbian to pay its 4.28571429% share. Neither Columbian nor the FDIC receiver did so. To satisfy the shortfall, Marshall allowed the other loan participants to fund Columbian's share in exchange for a pro-rata share of Columbian's unfunded participation interest. (The Lake Austin Agreement provided for this arrangement and noted that by allowing Marshall to pick up Columbian's remaining interest, Marshall was not giving up the right to seek payment from Columbian.) Marshall made 19 more advances to the borrower. Neither Columbian nor the receiver funded any of them. Marshall, for its part, did not file a claim with the receiver challenging the lack of payment before the November deadline.

In September 2009, after the final advance to the borrower, the receiver sold Columbian's interest in the Lake Austin Agreement to LNV Corporation. Around the same time, OSM became lead lender and servicer of the Lake Austin Loan. LNV refused to pay its (formerly Columbian's) 4.28571429% share of the prior advances and of the expenses OSM had incurred.

In June 2013, OSM sold the note on the Lake Austin Loan for $30 million. Citing LNV and its predecessor's failure to fund its share of advances and expenses, OSM refused to disburse any of the sale receipts to LNV.

## B. *Bahia Loan*

In 2007, BankFirst funded a $30 million loan to finance a different Florida development (the "Bahia Loan"). Through a series of assignments, LNV succeeded to a 3.33333333% participation interest in the Bahia Loan, BF-Negev—an OSM subsidiary—succeeded to the role of lead lender, and OSM succeeded to the role of loan servicer. LNV's interest in the Bahia Loan, like its interest in the Lake Austin Loan, was governed by a participation agreement (the "Bahia Agreement"). After the borrower defaulted, BF-Negev foreclosed on and sold the collateral. LNV was entitled

to approximately $65,000 of the proceeds, but BF-Negev withheld LNV's share as a setoff against what LNV owed OSM under the Lake Austin Agreement.

## C. *Procedural History*

In 2013, LNV sued OSM and BF-Negev asserting various legal theories to recover its alleged unpaid share under the two participation agreements. OSM and BF-Negev answered in part that (1) OSM's breach of the Lake Austin Agreement, if any, is excused by LNV's prior material breach; and (2) BF-Negev is entitled to set off LNV's share of the Bahia Loan proceeds by the amount LNV owes under the Lake Austin Agreement. OSM also counterclaimed, alleging that as a result of LNV's breach of the Lake Austin Agreement, LNV owed OSM money—not the other way around. According to OSM, LNV remains responsible for funding its (and Columbian's) original 4.28571429% interest under the Lake Austin Agreement. If LNV is held responsible for that full interest, then LNV owes OSM several million dollars. If, on the other hand, LNV is responsible for only 2.12424110%, then OSM owes LNV approximately $344,500.00 under that agreement.

The district court held, on summary judgment, that (1) it was statutorily barred from exercising jurisdiction over OSM's counterclaim, which effectively meant that LNV owned a 2.12424110% participation interest, rather than a 4.28571429% interest, in the Lake Austin Loan; (2) OSM was not excused from performing under the Lake Austin Agreement; and (3) BF-Negev was not entitled to set off LNV's proceeds under the Bahia Agreement against LNV's debt under the Lake Austin Agreement. OSM and BF-Negev appeal.

## II. *Discussion*

We review the district court's summary judgment ruling and its statutory interpretation de novo. *Liles v. C.S. McCrossan, Inc.*, 851 F.3d 810, 817 (8th Cir. 2017) (summary judgment); *Haug v. Bank of Am., N.A.*, 317 F.3d 832, 835 (8th Cir. 2003) (statutory interpretation).

A. *Whether FIRREA Bars Jurisdiction Over OSM's Counterclaim*

The district court held that the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA or "the Act") barred the court from exercising jurisdiction over OSM's counterclaim. FIRREA governs the handling of failed banks put into FDIC receivership. *See* 12 U.S.C. § 1821. Though it is "not a model of statutory clarity," *Bueford v. Resolution Tr. Corp.*, 991 F.2d 481, 486 (8th Cir. 1993), the Act defines the powers and duties of the FDIC acting as receiver for a failed bank, *see* 12 U.S.C. § 1821(d). The Act requires the receiver to "pay all valid obligations" of the failed bank in accordance with certain terms. *Id.* § 1821(d)(2)(H).[2] Highly relevant to this case, the Act establishes an administrative claims process to facilitate the receiver's duty to pay valid obligations.

The administrative claims process requires the receiver to promptly notify, and then twice re-notify, the failed bank's creditors to present their claims by a date certain. *Id.* § 1821(d)(3)(B). That deadline must be at least 90 days after notice is first given. *Id.* § 1821(d)(3)(B)(I). Then, within 180 days of presentation, the receiver must notify the claimant whether the claim will be allowed or disallowed. *Id.* § 1821(d)(5)(A)(I). The receiver must allow any timely claim proved to the receiver's satisfaction. *Id.* § 1821(d)(5)(B). If the receiver disallows a claim, then it must state why and inform the claimant of "the procedures available for obtaining agency review of the determination to disallow the claim or judicial determination of the claim." *Id.* § 1821(d)(5)(A)(iv)(II). Claims filed after the deadline must be disallowed unless (1) the claimant did not get notice of the receiver's appointment in time to file its claim before the deadline, and (2) there is still time to permit payment of the claim. *Id.* § 1821(d)(5)(C). The FDIC has interpreted this exception to apply to claimants on notice of the receiver's appointment but whose claims did not exist as of the deadline. *Heno v. FDIC*, 20 F.3d 1204, 1209 (1st Cir. 1994).

---

[2]The receiver may also disaffirm or repudiate certain contracts and pay limited damages. *See* 12 U.S.C. § 1821(e)(1), (3).

The Act provides two paths for seeking review of disallowed claims: "[T]he claimant may request administrative review of the claim . . . or file suit on such claim" in federal court. 12 U.S.C. § 1821(d)(6)(A). If the claimant takes neither path within the allowed time, "the claim shall be deemed to be disallowed . . . , such disallowance shall be final, and the claimant shall have no further rights or remedies with respect to such claim." *Id.* § 1821(d)(6)(B). Indeed, the judicial-review path in § 1821(d) is the only way to obtain judicial review of a claim; except as provided in subsection (d)(6), no court shall have jurisdiction over a claim. *Id.* § 1821(d)(13)(D). In other words, "exhaustion of FIRREA's administrative remedies [is] a jurisdictional prerequisite to suit in district court." *Bueford*, 991 F.2d at 484.

Against this backdrop, the district court held that (1) because the receiver did not disaffirm or repudiate the Lake Austin Agreement, *see* 12 U.S.C. § 1821(e), the receiver remained responsible for performing Columbian's obligations under it; (2) the receiver failed to perform Columbian's obligations; (3) OSM's counterclaim against LNV seeking to enforce an obligation the receiver failed to perform is a "claim relating to any act or omission of . . . the [FDIC] as receiver," *see id.* § 1821(d)(13)(D)(ii); and (4) § 1821(d)(13)(D) imposes an exhaustion requirement even on claims, such as those here, that arose after the claims-filing period. Consequently, the district court dismissed OSM's counterclaim for lack of jurisdiction. As purchaser of Columbian's interest through the receiver, LNV possessed a 2.12424110% participation interest, rather than a 4.28571429% interest, in the Lake Austin Agreement.[3] Thus, barring the contract defense we will address later, OSM owes LNV for its share of the $30 million proceeds from the sale of the Lake Austin note.

---

[3] Before discussing FIRREA exhaustion, the district court held that there was a disputed issue of material fact whether LNV had contractually assumed liability for the receiver's acts and omissions when acquiring the receiver's interest. We assume, without deciding, that LNV assumed this liability.

-6-

OSM makes three primary arguments for its counterclaim: (1) the receiver had two statutory ways to address its obligations under the pre-receivership Lake Austin Agreement—perform, or repudiate and pay damages—but that simply failing to pay is not an option; (2) OSM's counterclaim is not a "claim" subject to FIRREA's exhaustion requirement; and (3) even if the counterclaim is a claim subject to exhaustion, the exhaustion requirement does not apply to claims, such as OSM's, arising post-receivership, and especially not to claims arising after the claims-bar date. We address these arguments in turn.

### 1. *Repudiation*

OSM contends that we must allow initial judicial enforcement of the receiver's obligations (that is, enforcement outside the FIRREA claims process), because not doing so would result in "blanket immunity" for the receiver's breach of a contract that it had not repudiated. We disagree. Under FIRREA, if a receiver does not repudiate the contract, then it remains liable for the contract's obligations. 12 U.S.C. § 1821(d)(2)(H). If the receiver does not perform, then a creditor may file a claim. *Id.* § 1821(d)(3)(B), (5)(A)(I). The creditor–claimant may then seek administrative or judicial review of a disallowed claim within 60 days of the receiver's disallowance. *Id.* § 1821(d)(6)(A). So the alternative to repudiation is not immunity—the alternative is the FIRREA claims process.

OSM cites authorities for its argument, but they are either distinguishable or unpersuasive. The Ninth Circuit case of *Sharpe v. FDIC*, for example, involved a claim that the receiver had breached an unrepudiated pre-receivership settlement agreement. 126 F.3d 1147 (9th Cir. 1997). The court held that this claim could be brought initially in federal court, because to hold otherwise would leave the receiver "free to breach any pre-receivership contract, keep the benefit of the bargain, and then escape the consequences by hiding behind the FIRREA claims process." *Id.* at 1156. The court, however, did not explain why the FIRREA claims process would not adequately protect the claimant's interest—why, that is, a known claims process

would enable hiding. Thus, the court's conclusion that "FIRREA does not address the consequences of the FDIC's breach of the [plaintiffs]' settlement agreement" is unpersuasive. *Id.* at 1157. The receiver is not "in a better position when it breaches a contract than when it chooses to repudiate," *see id.*, because under either situation, the receiver must pay damages or have its obligations enforced through the claims process.

*Bank of Manhattan, N.A. v. FDIC* addressed whether the receiver "may breach underlying asset contractual obligations without consequence." 778 F.3d 1133, 1134 (9th Cir. 2015). *Bank of Manhattan*, however, addressed a different argument than we have here. The plaintiff in that case asked whether a receiver may assign a pre-receivership contract without giving the counterparty the notice required by a right-of-first-refusal provision. *Id.* The receiver said that its action was insulated from liability by § 1821(d)(2)(G)(i)(II), which allows the receiver to transfer any asset without consent. *Id.* The court held that if "the [receiver] violate[s] pre-receivership contracts rather than repudiate them under section 1821(e), . . . section 1821(d)(2)(G)(i)(II) does not afford the [receiver] immunity from subsequent actions for breach of contract." *Id.* at 1136. To hold otherwise, the court noted, would put the receiver in a better position than the bank into whose shoes it stepped. *Id.* Yet LNV is not arguing that the receiver (and LNV as successor) should be immune from its contractual obligations. To the contrary, LNV argues that the receiver is liable as provided under FIRREA's claims-adjudication process. LNV suggests that to hold that repudiation is the only out-of-court means to address pre-receivership contractual liabilities would largely nullify FIRREA's claims process.

*Waterview Management Co. v. FDIC* likewise held that § 1821(d)(2)(G)(i)(II) does not preempt state-law contract rights and does not provide blanket preemption of valid pre-receivership contracts. 105 F.3d 696, 698, 699 (D.C. Cir. 1997). *Waterview* did say that the receiver "can avoid the obligations imposed by such

agreements only by repudiating them in accord with" § 1821(e)'s repudiation provision. *Id.* at 699. But the court did not consider the administrative claims process.

In *Tri–State Hotels, Inc. v. FDIC*, on the other hand, we held that a party seeking to enforce a pre-receivership contractual obligation was barred from bringing that claim in court because the party did not go through FIRREA's claims process. 79 F.3d 707, 712–13 (8th Cir. 1996). We never mentioned repudiation, much less held that one could bypass the claims process merely because the receiver did not repudiate the contract. In sum, OSM, through its predecessor, was not excused from going through the FIRREA claims process merely because the receiver did not repudiate the Lake Austin Agreement.

2. *Whether OSM's Counterclaim is a "Claim" under FIRREA*

We also reject OSM's argument that its counterclaim is not a "claim" under FIRREA. The plain language of the Act makes the administrative claims process the exclusive remedy for "any claim relating to any act or omission of such institution or the [FDIC] as receiver." 12 U.S.C. § 1821(d)(13)(D)(ii). OSM's counterclaim alleges that the receiver, as predecessor of LNV, failed to perform its obligations under the Lake Austin Agreement. The counterclaim therefore relates to an act or omission of the receiver. Against this plain language, OSM pits *Sharpe*, which the Ninth Circuit itself has called an "unusual case." *See McCarthy v. FDIC*, 348 F.3d 1075, 1078 (9th Cir. 2003); *see also Bank of Manhattan*, 778 F.3d at 1139 (Rawlinson, J., dissenting).

Other courts, including ours, would consider OSM's counterclaim to be a "claim." In *Bueford*, we said that a Title VII claim against a failed bank was a claim that had to be exhausted under § 1821(d). 991 F.2d at 483, 483–84. And in *Tri–State Hotels*, we said that a breach-of-contract claim against a failed bank for not funding its contractual obligations had to be exhausted under § 1821(d). 79 F.3d at 710, 712. In *SunSouth Bank v. First NBC Bank*, the Eleventh Circuit recently held that seeking to enforce a participation agreement—the type of contract at issue here—against a

-9-

failed bank's successor is a claim that must be exhausted under § 1821(d). 678 F. App'x 811, 814 (11th Cir. 2017) (per curiam); *see also Vill. of Oakwood v. State Bank & Tr. Co.*, 539 F.3d 373, 386 (6th Cir. 2008) ("The problem with this novel argument is that all of [claimants'] claims against [successor bank] are directly related to acts or omissions of the FDIC as the receiver of [failed bank]."). OSM's counterclaim is a "claim" under FIRREA.

### 3. *Whether Post-Receivership Claims and Claims Arising After the Claims-Bar Date Are Subject to Exhaustion*

Finally, we disagree with OSM's assertion that its counterclaim is not subject to exhaustion because it arises from post-receivership and, in some cases, post-bar-date breaches by the receiver.

As OSM notes, no Eighth Circuit precedent addresses whether FIRREA's claims process applies to post-receivership claims—that is, claims arising after a receiver is appointed. *See RTC Mortg. Trust 1994–N2 v. Haith*, 133 F.3d 574, 580 (8th Cir. 1998). OSM acknowledges, though, that most circuits have held that it does. *See, e.g.*, *Vill. of Oakwood*, 539 F.3d at 387 ("The overwhelming majority of courts to address the issue have concluded that the administrative process applies to post-receivership claims."); *McCarthy*, 348 F.3d at 1080–81; *Stamm v. Paul*, 121 F.3d 635, 642 (11th Cir. 1997); *Home Capital Collateral, Inc. v. FDIC*, 96 F.3d 760, 763–64 (5th Cir. 1996).

Still, OSM urges us to adopt the contrary rule from *Homeland Stores, Inc. v. Resolution Trust Corp.*, which held that in adopting FIRREA's claims process, "Congress had in mind creditor and related claims arising before an institution enters receivership." 17 F.3d 1269, 1274 (10th Cir. 1994). The *Homeland Stores* rationale was, in part, that "claims . . . arising after receivership and in the indeterminate future due to management actions of the [receiver] cannot have been contemplated when [the] deadlines for filing administrative claims were set." *Id.*

We do not find *Homeland*'s rationale persuasive. *Any* breach by a receiver is unknown before it occurs; yet, as noted above, we see no textual reason why a timely filed post-receivership claim need not be, or could not be, handled through the administrative process. More importantly, and to OSM's point about claims arising after the claims-bar date, *Homeland Stores* lacked the benefit of FDIC guidance on how the FDIC handles claims filed after the bar date. The First Circuit, with the benefit of FDIC illumination, held contrary to *Homeland Stores* in *Heno*, 20 F.3d at 1209. Based on the FDIC's internal manual, that court concluded that

> FDIC construes the pivotal statutory bar-date exception in subsection 1821(d)(5)(C)(ii)—"the claimant did not receive notice of the appointment of the receiver in time to file such claim before [the bar] date"—as permitting late filing *even by claimants who were on notice of FDIC's appointment* [as receiver] but could not file their claim because it did not come into existence until after the bar date prescribed in subsections 1821(d)(3)(B)(i) and 1821(d)(5)(C)(i).

*Id.* (first alteration in original). In *Stamm*, the Eleventh Circuit agreed that not only would a receiver hear a claim that arose after the claims-bar date, but that if the receiver had insufficiently informed the would-be claimants of this fact, then "applicable administrative regulations and policy statements afforded them further guidance." 121 F.3d at 641. In addition to appearing in regulations and policy statements, this option has now been recognized by at least three published court opinions.[4] For its part, OSM has not denied that claims may be filed after the claims-bar date.

---

[4] *FDIC v. Scott*, 125 F.3d 254, 259 (5th Cir. 1997); *Stamm*, 121 F.3d at 641; *Heno*, 20 F.3d at 1209.

-11-

Accordingly, we join the courts that have held that post-receivership claims, including those arising after the claims-bar date, must be administratively exhausted under § 1821(d)(6) and (d)(13)(D).[5]

B. *Prior Material Breach*

The next issue on appeal is whether the district court properly held that OSM must pay LNV its 2.12424110% share of the proceeds from the sale of the Lake Austin note after subtracting LNV's share of unpaid expenses. OSM contends that even if it breached the Lake Austin Agreement by failing to pay LNV, that breach was excused by LNV's prior failure to pay its share of expenses as they came due. The district court held that only an *uncured* prior material breach may excuse performance, and that OSM cured LNV's breach by withholding LNV's share of the sale proceeds. The court also noted that the Lake Austin Agreement expressly provides a payment priority scheme allowing OSM to pay itself for unpaid expenses but requiring OSM to disburse the remainder proceeds to LNV.

We agree with OSM that the district court's primary theory (that OSM cured LNV's breach) is incorrect. It is true that New York law conditions future contract performance on there being no uncured prior material breach. *See U.W. Marx, Inc. v. Koko Contracting, Inc.*, 2 N.Y.S.3d 276, 278 (N.Y. App. Div. 2015); Restatement

_____

[5]We note that *Carlyle Towers Condominium Association v. FDIC*, on which OSM relies, is not to the contrary. 170 F.3d 301 (2d Cir. 1999). There the Association filed an untimely claim, which was disallowed, and then timely sued in district court. *Id.* at 304. The FDIC moved to dismiss, arguing that the court lacked jurisdiction over an untimely claim. *Id.* at 304. The Second Circuit disagreed and held that the claims-filing deadline is not jurisdictional, but rather a "filing period akin to a statute of limitations." *Id.* at 310. Here, OSM did not file an untimely claim—it filed no claim at all. *Carlyle Towers* therefore provides no support for OSM's theory.

-12-

(Second) of Contracts § 237 (Am. Law Inst. 1981).[6] But the district court cited no authority for the proposition that one party to a contract may be said to have "cured" the other's breach. The cases suggest that curing is the prerogative of the prior-breaching party. *See Cary Oil Co. v. MG Ref. & Mktg., Inc.*, 90 F. Supp. 2d 401, 408 (S.D.N.Y. 2000) ("If the breach is material and the *breaching party* fails to cure . . . ." (emphasis added)); *see also* Restatement (Second) of Contracts § 237 cmt. a, illus. 2, cmt. b, illus. 5, cmt. c, illus. 10 (Am. Law Inst. 1981).

Nevertheless, we agree with the district court that the parties' contract contemplates and governs their rights and responsibilities. The contract provides two ways to handle these facts. One, Section 3.4(d), authorizes OSM to advance LNV's share of expenses and to consider this advance an interest-bearing loan payable on two days' demand. (OSM did not exercise this option.) And two, Section 3.5, entitled "Disbursement of Collections to Participants," provides a mandatory priority scheme for disbursing collections. This scheme requires OSM to apply collections "to [itself] in payment of any unreimbursed or unpaid extraordinary expenses" before paying LNV. Thus, the contract requires OSM to pay LNV its 2.12424110% share of the $30 million sale proceeds minus LNV's 2.12424110% share of unpaid expenses.[7]

Had OSM sued LNV before the $30 million sale for failing to pay its share of expenses, this would be a different case. But with actual sale proceeds in hand, the parties' contract controls the parties' obligations and remedies. OSM's alleged common-law defense for not paying LNV the net proceeds is ineffective. The contract

---

[6]The parties agree that the Lake Austin Agreement is governed by New York law.

[7]LNV concedes that it is liable for 2.12424110% of the expenses incurred after September 2009. To the extent that OSM seeks to hold LNV liable for a 4.28571429% share of post-September 2009 expenses, we fail to see how LNV could be liable for a greater share of expenses than its total participation share, which, because OSM's counterclaim is jurisdictionally barred, is now fixed at 2.12424110%.

addresses LNV's alleged prior material breach, and OSM must comply with the contract.

## C. *Setoff*

The next issue is whether BF-Negev breached the Bahia Agreement by withholding LNV's share of proceeds under that agreement. BF-Negev contends that it was entitled to withhold LNV's proceeds as a setoff against what LNV owed OSM under the Lake Austin Agreement. The district court disagreed. It held that there was no mutuality between LNV's Lake Austin debt and its Bahia credit. The reason is simple—the parties to those contracts were different entities: OSM under the Lake Austin Agreement and BF-Negev under the Bahia Agreement.

The parties agree that Minnesota law governs the Bahia Agreement. Under Minnesota law, the right to set off exists only if "the debts are mutual—that is, between the same parties and in the same right." *Firstar Eagan Bank, N.A. v. Marquette Bank Minneapolis, N.A.*, 466 N.W.2d 8, 12 (Minn. Ct. App. 1991) (quoting *Nietzel v. Farmers & Merchs. State Bank of Breckenridge*, 238 N.W.2d 437, 440 (Minn. 1976)). OSM and BF-Negev contend that the district court missed the fact that BF-Negev had assigned OSM the right to "service and administer" the Bahia Loan. But OSM admits that BF-Negev remains "the lead Lender." And OSM has not shown that loan collections belong to the servicer rather than to the lead lender. If the collections do not belong to OSM, then OSM cannot withhold them as a setoff for a separate OSM contract. There is thus no mutuality of debts. One debt is owed by LNV to OSM; the other is owed by BF-Negev to LNV. Without this mutuality, there is no right of setoff. Without a right of setoff, BF-Negev breached the Bahia Agreement by withholding LNV's share of collections.

### D. *Attorney's Fees*

OSM asks us to reverse the district court's attorney's fee award if OSM wins on appeal and also suggests that we have discretion under New York law "to reverse a party's fee award when both parties breach the contract." Even if we have such discretion, we decline to exercise it here. LNV is of course entitled only to a net recovery—that is, a recovery subtracting LNV's responsibility for its own breach of contract. On these facts, though, LNV's net recovery was substantially more than it owed. It owed approximately $254,000 (2.12424110% of $11,956,695), and it received judgment for approximately $344,000 from OSM and $65,000 from BF-Negev. We therefore decline to reverse the fee award.

### III. *Conclusion*

Accordingly, we affirm the district court's judgment.

_____